## PEOPLE v EGGLESTON

Docket No. 81328. Submitted November 20, 1985, at Detroit.—Decided January 22, 1986. Leave to appeal applied for.

Defendant, Robert Eggleston, was convicted of assault with intent to commit murder, acquitted of first-degree criminal sexual conduct and sentenced to life in prison, Monroe Circuit Court, William J. Weipert, Jr., J. Defendant appealed. *Held:*

1. The court did not err in permitting a witness to testify as to defendant's prearrest statements denying all knowledge of any material facts. A criminal defendant's right to remain silent is not impinged on by the introduction of evidence to the effect that the defendant denied knowledge of any material information.

2. The court did not err in admitting evidence of statements made by defendant in response to questions by police at the time he and his brother were stopped for speeding but before they were arrested or given *Miranda* warnings. *Miranda* warnings are required prior to questioning a person who is in custody. The determination of whether a person is in custody at the time police interrogation took place must be based upon an examination of the totality of the circumstances. The key question to be answered in determining whether the person was in custody is whether that person could reasonably believe that he was not free to leave. The court correctly concluded that defendant was not in custody at the time of the questioning and that the evidence was admissible.

3. Evidence or statements made by a codefendant were not improperly admitted as hearsay since in one instance it was admitted to show that the statement was made and in the other to show the effect of the statement upon the hearer.

4. The failure of the trial court to articulate on the record

REFERENCES

Am Jur 2d, Criminal Law §§ 788-797, 964.

Am Jur 2d, Evidence §§ 250, 269, 497, 1175.

What constitutes "custodial interrogation" within rule of Miranda v Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.

See also the annotations in the ALR3d/4th Quick Index under Appeal and Error; Harmless Error.

the factors considered in ruling on the admissibility of evidence of prior convictions for impeachment purposes does not mandate reversal where the record reveals that the trial court was aware of its discretionary power to exclude or admit such evidence.

5. The trial court did not err in admitting during rebuttal certain evidence which defendant claimed properly belonged in the people's case in chief.

6. The sentence did not deviate from the guidelines or shock the conscience of the Court of Appeals. The court considered all the evidence offered in mitigation and did not deem it significant enough to justify reducing the offense rating, which is within the court's authority to do.

Affirmed.

1. CRIMINAL LAW — EVIDENCE — RIGHT TO REMAIN SILENT.

A criminal defendant's right to remain silent is not impinged on by the introduction of evidence to the effect that the defendant denied knowledge of any material information.

2. CRIMINAL LAW — CUSTODIAL INTERROGATION.

Custody, for the purposes of deciding whether there has been custodial interrogation by the police, arises when a person has been deprived of his freedom of action in a meaningful way.

3. CRIMINAL LAW — CUSTODIAL INTERROGATION.

The determination of whether a person is in custody at the time police interrogation took place must be based upon an examination of the totality of the circumstances; the key question to be answered in determining whether the person was in custody is whether that person could reasonably believe that he was not free to leave; if the person has that reasonable belief, the person is in custody for purposes of determining whether there was custodial interrogation by the police.

4. EVIDENCE — HEARSAY — VERBAL ACTS.

Evidence of a statement which was introduced to prove that the statement was made does not constitute hearsay.

5. CRIMINAL LAW — EVIDENCE — PRIOR CONVICTIONS — APPEAL — HARMLESS ERROR — RULES OF EVIDENCE.

A trial court's failure to comply with the Michigan Rule of Evidence requiring it to articulate on the record the factors considered in making the determination to permit the use of evidence of a prior conviction for impeachment is harmless error where the record reveals that the trial court was aware of

its discretionary power to exclude the use of such evidence (MRE 609[a][2]).

6. APPEAL — EVIDENCE — REBUTTAL.

The standard of review for determining whether reversal is necessary because of improperly admitted rebuttal evidence is whether the error was so egregious as to result in a miscarriage of justice.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *William F. Lavoy,* Prosecuting Attorney, and *Lawrence J. VanWasshenova,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Herb A. Jordan* and *Susan M. Meinberg),* for defendant.

Before: WAHLS, P.J., and R. B. BURNS and M. E. DODGE,* JJ.

PER CURIAM. Defendant was convicted of assault with intent to commit murder, MCL 750.83; MSA 28.278. The jury acquitted him on a charge of first-degree criminal sexual conduct, MCL 750.520b(1)(d); MSA 28.788(2)(1)(d) arising from the same incident. Defendant was sentenced on the assault conviction to serve life in prison. Defendant now appeals raising 11 issues, none of which require reversal.

According to the victim, on the night in question she was riding in a pickup truck with defendant and his brother, Elbridge Eggleston. Elbridge was driving and indicated to the victim that they were going to rape her and turned into a parking lot. In an attempt to escape, the victim unsuccessfully tried to kick out the front windshield. Defendant and his brother then threw the victim into the

* Circuit judge, sitting on the Court of Appeals by assignment.

back of the truck. Elbridge then entered the rear of the truck, removed the victim's shoes, blue jeans, and underwear and then raped her. Elbridge and defendant traded places and defendant then raped her. Defendant then pulled out a pocket-knife and stabbed the victim six or seven times in the chest. She tried to "play dead", but defendant continued to repeatedly rape her.

After a while, Elbridge stopped the truck, came to the back, and told defendant to let the victim go. Defendant replied that he was "going to finish the bitch off" and "dump her in the water". Elbridge returned to the front of the truck and resumed driving. The victim again attempted to play dead, but when she opened one eye, defendant stabbed her again. In all, the victim was stabbed 18 times.

The victim eventually managed to throw defendant off her and attempted to climb out the rear window, but defendant restrained her. She eventually fell off the truck onto a gravel road, wearing only her socks. She ran to a nearby home, where the owners summoned the police and a rescue squad. She was treated at a local hospital for multiple stab wounds, contusions, and abrasions. A cursory examination showed no evidence of rape, but she did suffer from a collapsed right lung.

Meanwhile, a state police trooper stopped defendant and his brother, who was still driving, for speeding. While conducting a sobriety test, one of the troopers noticed the cracked windshield and, upon closer examination, found blood in the back of the truck. The troopers then looked inside the truck and found a woman's shoe, watch, underwear, and a blood-stained knife. After reporting this information over the radio, they were informed to hold the suspects for the sheriff's department in connection with the rape and assault. The

Egglestons were taken into custody and charged with rape and assault.

At trial, defendant told a substantially different version of the events of the evening in question. He admitted that the victim had been riding with his brother and him. However, defendant stated that at one point the victim began kissing him and she soon began to perform fellatio on him. According to defendant, the windshield became cracked when the victim hit her head against it when Elbridge stopped the truck suddenly. At some point, defendant and the victim went into the back of the truck, where the victim became angry at defendant over his inability to have intercourse with her. She then attacked him with an electrical cord and defendant pulled his pocketknife and stabbed her in self-defense. The victim then jumped from the truck.

Defendant first claims that the trial court erred in permitting a witness to testify as to defendant's prearrest statements denying all knowledge of any material facts. Defendant asserts that the testimony of state trooper John Norvell, recalling what defendant said when asked about the blood on the truck and his clothes, constitutes impermissible commentary on defendant's silence. As a general rule, comment at trial about a defendant's silence is impermissible. *People v Bobo,* 390 Mich 355; 212 NW2d 190 (1973).

However, *Bobo* is inapplicable to the instant case since this is not a situation where the defendant was silent. Instead, this is an instance where the use of a voluntary statement by the defendant is at issue. This Court has held that a *Bobo* analysis is inappropriate where the defendant denies knowledge of any material information, not by silence, but by a verbal statement. *People v Hunt,* 68 Mich App 145, 147; 242 NW2d 45 (1976).

We next consider defendant's claim that the trial court committed reversible error in admitting into evidence statements made by the defendant after being stopped by police for speeding but before being arrested or read his rights.

Defendant claims that his statements in response to questions about the blood on his brother's truck and his clothes were made before he was read his *Miranda*[1] rights, and therefore should not have been admitted at trial. Because there is no doubt that defendant was asked about the blood, and that his *Miranda* rights had not been read to him at that time, the pivotal issue here is whether or not the defendant's freedom was constrained so as to mandate the giving of *Miranda* warnings before questioning.

In analyzing this *Miranda* issue, we apply the classic "custody" analysis of *Miranda. People v Paintman,* 412 Mich 518; 315 NW2d 418 (1982); *People v Belanger,* 120 Mich App 752; 327 NW2d 554 (1982).[2]

The most basic definition of what is "custody" is that found in *Miranda,* which defines this term as being "taken into custody or otherwise deprived of his freedom of action in any significant way". 384 US 444; 86 S Ct 1612; 16 L Ed 2d 706. Several years later, the Court cautioned against reading

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] We recognize that a "focus" analysis has been advanced, with the key determination being whether a criminal investigation has "focused" on the defendant at the time of the questioning. *People v Brannan,* 406 Mich 104; 276 NW2d 14 (1979); *People v Reed,* 393 Mich 342; 224 NW2d 867 (1975); *People v D'Avanzo,* 125 Mich App 129; 336 NW2d 238 (1983).

In the instant case, there was no investigation occurring at the time defendant was asked about the blood. Thus, there could be no "focus" and that test is not applicable. The key question is whether or not defendant was in "custody" when he made the objected-to statements.

this too broadly, particularly in a "noncustodial" situation:

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. * * * Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited." *Oregon v Mathiason*, 429 US 492, 495; 97 S Ct 711; 50 L Ed 2d 714 (1977). (Emphasis in original.)

Consequently, this Court has recently defined "custody" as "whether the defendant could reasonably believe that he was not free to leave". *People v Blackburn*, 135 Mich App 509, 518; 354 NW2d 807 (1984).

Applying the *Blackburn* definition in light of *Mathiason*, we conclude that defendant was not in "custody" in this case. Elbridge had been stopped because he was speeding and was being administered a sobriety test when the blood and the hole in the windshield were discovered. It was only then that defendant was asked about the blood, and at that time the state troopers, while possibly suspicious, were still operating as if it were a routine traffic stop. Not until after the radio request from the sheriff's department came in did they "hold" the defendant, and that was several minutes after defendant had made the statements at issue. The whole time defendant was sitting in his brother's truck, not in the patrol car. At no point before or during defendant's statement did

he have any reason to believe he would not be free to go after his brother received a citation.

We now consider whether the trial court erred in permitting prosecution witnesses to testify as to statements made by a codefendant. Defendant contends that two statements by Elbridge, recounted by prosecution witnesses, constituted inadmissible hearsay. The first, recounted by the victim, referred to a statement made while she was being driven home by the Egglestons:

"*Q.* When you left, you left Jan's at that point?
"*A.* Yes.
"*Q.* Where did you go?
"*A.* They said they was taking me home and turned. We went around to Oakwood and then we turned on Oakwood, and Oakwood turns into Fort Street as you keep going down, but when we got up by Blue Jackets, Elbridge said what would you say if we said we was gonna rape you?"

The second, recounted by both state trooper Michael Scott and trooper John Norvell, dealt with Elbridge Eggleston's response to questioning by the troopers (after being stopped for speeding) as to the source of the blood on his truck:

"*Q.* When you came back to the back of the truck there with the driver, which would be Elbridge Eggleston, and Trooper Scott, was this the first time you noticed this blood?
"*A.* Yes, sir.
"*Q.* When you noticed it, what did you do? Did you make any remark?
"*A.* I directed Trooper Scott's attention to it.
"*Q.* What happened at that point?
"*A.* At that point, we inquired of the driver the origin of the blood on the vehicle.
"*Q.* Did he give you any idea where it came from?

"*A.* He told us his brother had taken the truck deer hunting."

Neither of these statements constitute hearsay testimony, as they were not introduced to prove the truth of the matter asserted. Instead, there were two other purposes for the introduction of this testimony. First, it was introduced simply to show a statement was made, and this will not constitute hearsay. *People v Cortez,* 131 Mich App 316; 346 NW2d 540 (1984); *People v Garcia,* 31 Mich App 447; 187 NW2d 711 (1971). Second, and this is particularly applicable to the victim's statement, the testimony was introduced to show the effect of the statement on the hearer, which also does not constitute hearsay. *People v Lee,* 391 Mich 618; 218 NW2d 655 (1974). The victim's statement was not introduced to prove that the Egglestons intended to rape her, and the trooper's testimony was not intended to establish that defendant had or had not gone deer hunting, or even that Elbridge knew the truth or falsity of his statement. Consequently, the trial court did not err.

We now consider defendant's argument that the trial court erred by allowing use of evidence of two of defendant's prior felony convictions without articulating on the record the factors considered in determining their admissibility, contrary to the requirements of MRE 609(a)(2). While one panel of this Court has mandated articulation on the record as required by the rule, *People v Terryes Johnson,* 122 Mich App 172; 333 NW2d 32 (1982), this is not indicative of the recent trend in decisions. The vast majority of the panels of this Court which have ruled on this issue over the past three years have held that, regardless of the language of MRE 609(a)(2), the failure of the trial court to

articulate on the record the factors considered in ruling on the admissibility of evidence of prior convictions does not mandate reversal. See *e.g., People v Gendron,* 144 Mich App 509; 376 NW2d 143 (1985); *People v Cummings,* 139 Mich App 286; 362 NW2d 252 (1984); *People v Ferrari,* 131 Mich App 621; 345 NW2d 645 (1983); *People v Steele,* 115 Mich App 758; 321 NW2d 804 (1982).

We agree with the recent statement of this Court in *Gendron, supra,* p 517:

"Instead, we conclude that the failure to comply with MRE 609(a) is harmless error if the record reveals that the trial court was aware of its discretionary power to exclude the use of the evidence of prior convictions."

In the case at bar, a review of the transcripts indicates to us that the trial court was aware of its discretion and did not affirmatively misapply the applicable factors. Therefore, we conclude that any error present on this issue is harmless.

The next issue to be considered is whether the trial court abused its discretion in allowing certain evidence to be presented by the prosecution in rebuttal, which defendant claims properly belonged in the people's case in chief.

The decision to admit evidence in rebuttal is within the trial court's discretion. *People v Daleo,* 43 Mich App 386; 204 NW2d 315 (1972). A defendant's conviction should be reversed because evidence was improperly allowed in at rebuttal only if the error was "so egregious as to result in a miscarriage of justice". *People v Etchison,* 123 Mich App 448, 451; 333 NW2d 309 (1983).

The evidence in question is photographs of defendant taken shortly after his arrest and a map of Monroe County. This evidence was used to contradict defendant's testimony that the victim

had assaulted him and his statement as to where the victim exited from the truck. We do not believe that the admission of this evidence was improper.

Finally, we consider whether the trial court abused its discretion in sentencing defendant to life in prison. Defendant first claims that the court improperly scored the offense under the sentencing guidelines by failing to take into account the mitigating circumstances. It is clear to us that the court did not deviate from the sentencing guidelines. After scoring defendant's offense and prior record variables, he is placed in the IIID range, which recommends a minimum sentence range of 180 months to life. Defendant's sentence is within this range.

Had the trial court concluded that mitigating circumstances did exist, the offense would have been scored at the IID range, with a minimum sentence range of 72 to 120 months. However, we do not believe that a trial court is required to score a mitigation variable simply because the defendant requests it or because mitigation was raised at trial. The court did consider all mitigating circumstances in making his sentencing decision, but simply did not consider the evidence of mitigation significant enough to justify reducing the offense rating. The trial court was within its power and authority to do so. It cannot be said that the sentence imposed departed from the guidelines.

Nor does the sentence imposed shock our conscience. *People v Coles,* 417 Mich 523; 339 NW2d 440 (1983). The victim suffered a brutal attack at the hands of defendant, having been stabbed some 18 or 19 times. The attack was terminated only by the fact that the victim was able to jump from the moving truck and reach a place of safety before

defendant and his brother could find her once again. A review of the sentencing transcript indicates that the trial court was deeply incensed at this crime, a feeling which we share. We find no abuse of discretion by the trial court in sentencing defendant to life in prison.

We have considered the various other issues raised by defendant on appeal and conclude that they require neither reversal nor discussion.

Affirmed.