# STATE OF MICHIGAN

# COURT OF APPEALS

---

KERRY JENDRUSINA,

        Plaintiff-Appellant,

v

SHYAM MISHRA, M.D. and SHYAM N.
MISHRA, M.D., P.C.,

        Defendants-Appellees.

FOR PUBLICATION
August 4, 2016
9:00 a.m.

No. 325133
Macomb Circuit Court
LC No. 2013-003802-NH

---

Before: GLEICHER, P.J., and JANSEN and SHAPIRO, JJ.

SHAPIRO, J.

Plaintiff Kerry Jendrusina filed this medical malpractice case against his primary care physician, Dr. Shyam Mishra, a specialist in internal medicine. Defendant filed a motion for summary disposition asserting that the Notice of Intent, and therefore the complaint, had not been timely filed. Plaintiff responded that the claim had been initiated within the six-month discovery period defined by the Legislature in MCL 600.5938a. That statute provides in pertinent part: "[A]n action involving a claim based on medical malpractice . . . may be commenced . . . within 6 months after the plaintiff discovers or *should have* discovered the existence of the claim[.]" MCL 600.5938a(3) (emphasis added). The trial court granted defendant's motion finding that claim was not timely. In so ruling, the trial court effectively substituted the phrase *"could have"* for *"should have"* in the statute. Because we are to follow the text of the statute as written, we reverse and remand.

On January 3, 2011, plaintiff went to the hospital with flu-like symptoms. He was found to be dehydrated and after performing various tests, the hospital staff determined that plaintiff was in irreversible kidney failure. As a result he was placed on lifetime dialysis with its attendant morbidity and mortality.

Plaintiff asserts that defendant failed to take action as required by the relevant standard of care, such as a referral to a nephrologist (kidney specialist), despite the fact that for several years plaintiff's blood tests—contained within plaintiff's medical chart maintained by Dr. Mishra— demonstrated worsening and eventually irreversible kidney disease. Plaintiff further asserts that had Dr. Mishra complied with the standard of care, plaintiff's irreversible kidney failure would have been avoided.

-1-

According to plaintiff, he did not discover the existence of his claim until September 20, 2012. On that date, plaintiff was seen by Dr. Jukaku Tayeb, a treating nephrologist. According to plaintiff's testimony:

> [Dr. Tayeb] came in and what it was, he got full biopsy, not just a short version out of Clinton Henry Ford, out of Detroit. He got that and he read through it and reviewed the case and talked to the pathologist, I guess, and he goes, "I got your full pathology report here," and he goes, "Did your doctor—why didn't you come to a nephrologist?" I said I was with an internist. The internist said everything was fine . . . . Then he started ranting, saying, "The doctor should have sent you. I could have kept you off dialysis. You should have come here years ago. I could have prevented you from being on dialysis and you going into full kidney failure, if you would have come to a nephrologist early on."

Plaintiff testified that when Dr. Tayeb told him this, he "was shocked. I was dumbfounded. That was like someone punching me in the gut." He testified that before that conversation with Dr. Tayeb he did not know his kidney failure had developed over years and could have been avoided with an earlier referral and treatment. He testified that until then "I thought it happens, it happens." He testified that immediately after this visit with Dr. Tayeb he called his wife and said "Oh, my God. I think Mishra screwed up" and the following day he contacted an attorney. Calculating the six-month discovery period from September 20, 2012, plaintiff timely initiated this case. The trial court concluded, however, that plaintiff should have discovered the existence of his claim when he was diagnosed with kidney failure in January 2011.

In reviewing the trial court's analysis we must be strictly guided by the language of the statute. "If the language of a statute is clear and unambiguous, this Court must enforce the statute as written." *People v Dowdy*, 489 Mich 373, 379; 802 NW2d 239 (2011).

> Our function in construing statutory language is to effectuate the Legislature's intent. Plain and clear language is the best indicator of that intent, and such statutory language must be enforced as written. [*Velez v Tuma*, 492 Mich 1, 16-17; 821 NW2d 432 (2012).]

Significantly, we note that the legislature chose the phrase "should have" rather than "could have" in the statutory text. According to the New Oxford American Dictionary (3rd ed), "could" is "used to indicate *possibility*" whereas "should" is "used to indicate what is *probable*." (Emphasis added).[1] Thus, the inquiry is not whether it was *possible* for a reasonable lay person to have discovered the existence of the claim; the inquiry is whether it was *probable* that a reasonable lay person would have discovered the existence of the claim.

Plaintiff's medical chart maintained by Dr. Mishra includes the results of his routine blood tests. Beginning in 2007, lab reports filed within the chart consistently contained

---

[1] Other dictionaries provide consistent definitions. Merriam-Webster's Collegiate Dictionary (11th ed) defines "could" as "an alternative to *can* suggesting less force or certainty" (emphasis in original) and "should" as "used in auxiliary function to express obligation." Random House Webster's College Dictionary (2nd ed) defines "could" as "used to express conditional possibility or ability" and "should" as "used to indicate duty, propriety, or expediency."

abnormal and worsening levels of two blood measures related to kidney function: *creatinine*[2] and *eGFR*.[3]

   While these test results are clearly relevant to the issue whether Dr. Mishra complied with the standard of care, they are not relevant to when plaintiff should have discovered his potential claim unless there is evidence that plaintiff was made aware of the repeated and increasingly abnormal findings of kidney disease. Defendant offers no evidence that this was the case. First, on this record it is undisputed that defendant's office never provided plaintiff with copies of his lab reports. Second, plaintiff testified that defendant never told him that he had kidney disease or that he might develop kidney disease. Indeed, given defendant's failure to introduce contrary evidence, defendant has not even created a question of fact on the issue.[4]

   Defendant points out that in a 2008 office note, Dr. Mishra wrote down a diagnosis of "chronic renal failure." However, the note contains no reference to a discussion of this with the patient, i.e. plaintiff, and plaintiff testified that no such discussion ever occurred. Specifically, plaintiff testified as follows:

   *Q*. I'm looking at your records from Dr. Mishra's office, December 22nd, 2008, so this would have been a few days before Christmas at the end of 2008. Dr. Mishra had diagnosed you with chronic renal failure; do you remember that?

   *A*. No, he never told me that.

   *Q*. You don't remember having any discussion with him about that then?

   *A*. No, not at all.

   *Q*. You had swelling in your legs at that time. Do you remember that?

   *A*. Yes. He said it was because of my weight problem.

---

[2] Creatinine is a waste product of muscle metabolism that is normally filtered out by the kidneys and discharged in urine. Standard blood test panels include a measure of creatinine in the blood. According to the record before us, normal blood levels of creatinine are in the range of 0.5 to 1.3. If creatinine levels go above that range it suggests that the kidneys are not adequately filtering creatinine which may be a sign of kidney failure. According to Dr. Mishra's records, plaintiff's creatinine level in 2007 was 1.5. Over the next several years, plaintiff's creatinine level, according to Dr. Mishra's chart, grew increasingly elevated until by the end of 2010 it was at 4.99.

[3] The lab measure known as eGFR refers to "estimated glomerular filtration rate" and should normally be greater than 60. Beginning in 2007, plaintiff's level fell below 60 and continued to decrease over the next five years until it was measured at 12 in 2011.

[4] Even if there was a question of fact, it should be resolved by the jury, not by the trial court on a motion for summary disposition. See *Kincaid v Cardwell*, 300 Mich App 513, 523; 834 NW2d 122 (2013).

*Q*. So you don't remember any discussion December 2008 about having chronic renal failure?

[objection omitted.]

*A*. No.

*Q*. When is the first time you recall having a discussion with Dr. Mishra about kidney failure?

*A*. He never discussed it with me . . . .

Defendant has not submitted any evidence indicating that, contrary to plaintiff's testimony, he discussed this diagnosis with plaintiff. As noted, the office chart does not indicate that the diagnosis was relayed or discussed with the patient and it is undisputed that plaintiff neither saw or had copies of those records until after he retained an attorney, immediately following the September 20, 2012 conversation with Dr. Tayeb[5].

In *Solowy v Oakwood Hosp*, 454 Mich 214, 221-222; 561 NW2d 843 (1997), our Supreme Court held that what the claimant discovered or should have discovered is "a possible cause of action." This point was critical in *Solowy* because in that case the plaintiff did not dispute that she knew her doctor might have committed malpractice. See *id*. at 225. Instead, she argued that the six-month timeframe was not triggered until she had, in her own mind, confirmed that this was the case. *Id*. at 218-219. The facts of *Solowy* merit description. In 1986, the plaintiff had had a skin cancer on her ear. *Id*. at 216. The defendant excised it and, according to the plaintiff, he told her in the same year that the cancer was "gone." *Id*. at 216-217. Then in 1992, the plaintiff discovered a similar lesion on her ear at the same site, but she took no action for some time because of the defendant's assurance that the cancer was gone. *Id*. at 217-218. Eventually she went to a new doctor who advised that the new lesion was either a recurrence of the prior cancer or a benign lesion. *Id*. at 217. A biopsy showed that it was a recurrence and the plaintiff claimed that a more invasive surgery was required due to the defendant's incorrect assurance to her that the cancer was gone. *Id*. at 217-218. The plaintiff filed suit less than six months from the date of the biopsy, but more than six months from the date the second doctor told her that the lesion might be a recurrence of her cancer. *Id*. at 218.

The plaintiff argued that even though she knew that she had a *possible* cause of action after being so advised, it was only after the biopsy that she knew or should have known that she had an *actual* cause of action. *Id*. at 224-225. She argued that had the biopsy been benign she would have learned that her possible cause of action was, in fact, not a cause of action. *Id*. The *Solowy* Court concluded that the discovery date is when the plaintiff learns of a "possible cause of action" rather than learning of a "certain" cause of action. *Id*. at 221-222. However, the *Solowy* Court continued to apply the "should have" standard, stating:

---

[5] In addition, despite the fact that defendant obtained an order to conduct ex parte meetings with plaintiff's physicians, the record contains no testimony or affidavits from any of these physicians that prior to the September 20, 2012 conversation with Dr. Tayeb, they advised plaintiff that his kidney disease could or should have been recognized and treated years earlier by Dr. Mishra.

> the discovery rule begins to run when, on the basis of objective facts, the plaintiff should have known of a possible cause of action. [*Id*. at 222.]

In *Solowy*, the time began to run when the plaintiff learned that there was a significant chance—in *Solowy* it was 50/50—that her doctor had committed malpractice. She knew that if her diagnosis was skin cancer that she had grounds to file suit because she had previously had skin cancer at that location, it had been treated, and her doctor told her that it was "gone." *Id*. at 217, 224.

In the instant case, the record does not support the view that, when diagnosed with kidney failure, plaintiff "should have known of a possible cause of action." As far as he knew, he had no previous history of kidney disease and did not know of the lab reports showing that his kidney failure was the result of a slowly progressing condition rather than an acute event. In *Solowy,* the plaintiff knew that her doctor might have committed malpractice as soon as the tumor grew back; she was only waiting to learn whether she was in fact injured as a result of his actions. In this case, the opposite is true; after diagnosis in January 2011, plaintiff knew he was sick, but lacked the relevant data about his worsening lab reports and the medical knowledge to know that his doctor might have committed malpractice. The critical difference between the plaintiff in this case and the plaintiff in *Solowy* is that in *Solowy* the plaintiff neither required nor lacked special knowledge about the nature of the disease, its treatment, or its natural history.[6] She knew exactly what her relevant medical history was at all times. She simply delayed pursuing her claim in order to wait for final confirmation of what she already knew was very likely true. Moreover, the *Solowy* plaintiff had visible symptoms that were clearly recognizable as a likely recurrence of her skin cancer long before the ultimate diagnosis. Here, plaintiff's first recognizable symptom, i.e. urine retention, did not occur until January 2011 when it precipitated his hospitalization.

"[T]he discovery rule period begins to run when, on the basis of objective facts, the plaintiff should have known of a possible cause of action." *Id*. at 222. An objective standard, however, turns on what a reasonable, ordinary person would know, not what a reasonable physician (or medical malpractice attorney) would know. Thus, the question is whether a reasonable *person*, not a reasonable *physician* would or should have understood that the onset of kidney failure meant that the person's general practitioner had likely committed medical malpractice by not diagnosing kidney disease.

Indeed, defendant does not contend that a reasonable lay person understands the anatomy, physiology, or pathophysiology of kidneys. One would be hard pressed to find a reasonable, ordinary person, who is not a medical professional, who knows what creatinine is or what an abnormal creatinine level means, in addition to knowing how kidneys fail, why they fail, and how quickly they can fail.[7]

---

[6] "Natural history" is a medical term meaning the expected course of a disease absent treatment. See Merriam-Webster's Collegiate Dictionary (11th ed). For example, whether kidney failure can occur suddenly or only over an extended period of time requires knowledge of the "natural history" of kidney disease.

[7] Our dissenting colleague suggests that any reasonable person would know that kidney failure must develop over a long period. She offers no grounds for such a conclusion. Moreover, her

Moreover, plaintiff did not visit Dr. Mishra specifically for kidney problems. He saw him as a primary care provider for over 20 years. Unlike the plaintiff in *Solowy*, plaintiff never had surgery or even any treatment for the relevant organ or condition. He had routine complete blood counts and metabolic lab work done, as does virtually every patient who undergoes annual physicals. There is no evidence that he ever saw the blood test reports that showed the normal reference ranges, which would have revealed that his creatinine levels were high, or that he was ever advised of the relationship between creatinine level and kidney disease. Defendant suggests that because he once ordered a kidney ultrasound for plaintiff after an episode of edema and one slightly elevated lab report in 2008, plaintiff should have realized upon diagnosis of kidney failure that he had kidney disease back in 2008. However, the ultrasound was reported as normal.[8] Assuming that a reasonable, ordinary person would even recall a normal ultrasound performed years earlier, there is no reason that such a person would consider a *normal* ultrasound result as evidence that Dr. Mishra was at the time simultaneously committing malpractice in some manner. Rather, the normal ultrasound rationally supported that Dr. Mishra had made no errors at all. The mere *performance* of a non-invasive, commonly-administered kidney imaging study yielding a normal result, does not constitute an "objective fact" from which plaintiff should have surmised that he had a possible cause of action when later diagnosed with kidney failure. See *Solowy*, 454 Mich at 222.

It was *possible* for plaintiff to have discovered the existence of a possible claim shortly after presenting to the hospital and being told that he had kidney failure. To have done so, however, he would have had to have undertaken an extensive investigation to discover more information than he had. Presumably, plaintiff could (1) studied the various causes and speeds

---

assertion is inconsistent with medical knowledge. Kidney failure can occur very quickly and has several possible causes such as reduction in blood flow, allergic reaction, infection, adverse reaction to medication, dehydration, stones, cancer, nerve damage and others. See http://www.mayoclinic.org/diseases-conditions/kidney-failure/basics/causes/con-20024029 (accessed April 28, 2016). And contrary to the dissent's claim, we do not cite this medical text to justify plaintiff's belief; we do so to refute the dissent's claim that plaintiff's belief was inconsistent with science and therefore unreasonable.

[8] The dissent suggests that plaintiff was "consistent[ly]" told by Dr. Mishra that his blood tests were being done specifically due to concern about his kidneys and that after each test, Dr. Mishra assured plaintiff that his kidneys were fine. However, this suggestion is not consistent with the record. As already noted, plaintiff testified that he was told only once, in late 2008, that his "kidney number" on a single blood test was a little high and that he was correctly advised that an ultrasound done to follow up was normal. There is *no* testimony that Dr. Mishra thereafter discussed plaintiff's kidney health with him except in notifying him that his annual blood tests, which included many non-kidney tests, were normal. The dissent's characterization of these communications as revealing to plaintiff that he had "abnormal kidney level*s* (i.e. plural)" is inaccurate. There is a substantial and striking difference between a single conversation three years prior to diagnosis and a subject of repeated discussion. Thus, contrary to the dissent's argument, the 2012 diagnosis was not "plainly contradictory to everything Dr. Mishra had said up until that point." Dr. Mishra likely told plaintiff many things between 2008 and 2012. Regarding plaintiff's kidneys, there were but two conversations: one in 2008 referencing a mildly elevated test, and the accurate report of a normal kidney ultrasound in early 2009.

of progression of kidney disease, (2) requested copies of his previous years' blood test reports, and (3) considered whether there were signs of progressive kidney disease in those reports. However, there is no basis in statute, common law, or common sense to impute such a duty to people who become ill.

Defendant seems to suggest that the diagnosis of any serious illness in and of itself suffices to place on a reasonable person the burden of discovering a potential claim against a primary care physician if at any time in the past the physician *tested* an organ involved in a later diagnosis and reported normal results.[9]  Certainly any new diagnosis or worsened diagnosis or worsened prognosis is an "objective fact," but it is a substantial leap to conclude that this fact alone *should* lead any reasonable person to *know* of a possible cause of action.  We agree that anytime someone receives a new diagnosis, worsened diagnosis, or worsened prognosis, that individual *could* consider whether the disease could or should have been discovered earlier. Moreover, diligent medical research and a review of the doctor's notes may reveal that an earlier diagnosis should have been made.  That, however, is not the standard.  We must determine what the plaintiff "should have discovered" on the basis of what he knew or was told, not on the basis of what his doctors knew or what can be found in specialized medical literature.  Thus, the elevated levels of creatinine in plaintiff's blood tests during prior years is of no moment given the absence of any evidence that plaintiff ever saw those reports or that he knew what the word "creatinine" meant, let alone the pathophysiology of kidney failure, its measures, its causes, its natural history, or its treatment.[10]

To hold as defendant suggests would not merely be inconsistent with the text of the statute.  It would also be highly disruptive to the doctor-patient relationship for courts to advise patients that they "should" consider every new diagnosis as evidence of possible malpractice until proven otherwise.  Had the legislature intended such a result it would have use the phrase "could have discovered," not "should have discovered."

On the present facts, defendant has demonstrated that before the September 20, 2012 meeting with Dr. Tayeb, plaintiff *could* have discovered that he had a possible cause of action for malpractice.  However, the statute triggers the six-month discovery period only when plaintiff *should* have discovered that he had a possible cause of action.  Given the plain language of the statute, the trial court erred in granting defendant's motion for summary disposition.[11]

---

[9] The discovery rule does not incorporate the logical fallacy of *post hoc, ergo propter hoc* (after this, therefore because of this).

[10] Although plaintiff's kidney disease was diagnosed after he had undergone tests for kidney disease (among many other tests), it simply does not follow that the tests were related to his disease.  More information was required to make that link, and that information was supplied by Dr. Tayeb.

[11] Plaintiff also challenges another ruling which we agree was erroneous.  However, in light of our ruling the issue appears to be moot.  Before being deposed plaintiff provided an affidavit to the trial court, averring, as he later did in his deposition, that he had spoken with Dr. Tayeb on September 20, 2012, and that, on that date, Dr. Tayeb informed him that had he been referred to nephrologist earlier, he may have delayed or avoided his current state of renal failure and

Reversed and remanded for further proceedings. We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Elizabeth L. Gleicher

---

dialysis. More specifically, plaintiff averred that Dr. Tayeb stated that defendant's failure to refer plaintiff to a nephrologist was inappropriate and was a serious contributor to plaintiff's medical condition. Plaintiff presented this affidavit in his brief addressing the timeliness of his claim. The trial court refused to consider the affidavit on the grounds that it was inadmissible hearsay. This ruling was erroneous as matter of law given that the affidavit was not offered for the truth of the matter asserted by the declarant. See *People v Eggleston*, 148 Mich App 494, 502; 384 NW2d 811 (1986) (holding that statements were not hearsay because they were not introduced to prove the truth of the matter asserted). Plaintiff did not offer the evidence to prove that defendant was negligent and whether Dr. Tayeb's alleged statements were accurate is not relevant to the present issue. Plaintiff relied on Dr. Tayeb's alleged statement only to demonstrate how and why he became aware of his possible malpractice claim, not that Dr. Mishra was negligent or that his negligence was a proximate cause of any damages. The trial court, therefore, erred in ruling that the affidavit contained inadmissible hearsay for this purpose. See *id*.